IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
JUL - 2 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| THE EXTRADITION OF | ) |
| | ) |
| NEHAL DEEPAK MODI | ) |

25-mj-5144

## COMPLAINT
### (18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.     In this matter, I represent the United States of America in fulfilling its treaty obligations to India.

2.     There is an extradition treaty in force between the United States and India. *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of India, U.S.-India, June 25, 1997, S. TREATY DOC. NO. 105-30 (1997) (the "Treaty").

3.     Pursuant to the Treaty, the Government of India has submitted a formal request through diplomatic channels for the extradition of Nehal Deepak Modi ("Modi" or the "fugitive").

4.     According to information the Government of India has provided, Modi is

charged with: (1) money laundering, in violation of the Prevention of Money Laundering Act ("PMLA"), 2022, Section 3 (PMLA Special Case No. ECIR/MBZO-I/03/2018); and (2) conspiracy to cause disappearance of evidence of an offense or to give false information to screen an offender, in violation of Sections 120-B and 201 of the Indian Penal Code ("IPC") (Criminal Case No. RCBSM 2018 (E) 001 of CBI, BSFB, Mumbai).[1]

5.     These offenses were committed within the jurisdiction of India. On July 27, 2018, Special Judge M.S. Azmi, Court of Sessions for Greater Mumbai, issued a warrant for Modi's arrest for the aforementioned money laundering charge. Additionally, on June 29, 2020, Special Judge V.G. Barde, City Civil & Sessions Court for Greater Mumbai, issued a warrant for Modi's arrest for the aforementioned conspiracy charge. Modi has been in jail in the custody of the New York State Department of Corrections here in the United States on separate and unrelated New York State criminal charges since on or about July 29, 2022. He is presently housed in Wende Correctional Facility in Alden, New York, as further referenced below in paragraph 7. The laws of India govern India's Treaty request for the extradition of Modi to India, and there is no applicable statute of limitations bar under the laws of India to the referenced criminal charges against Modi in India.

6.     The materials from India reflect the following:

    a. Between approximately 2011 and 2017, Modi's brother, Nirav Modi ("Nirav"), fraudulently obtained numerous Letters of Undertaking (LOUs) from Punjab National Bank's (PNB) Brady House branch in Mumbai.

---

[1] Modi is charged with additional violations of Indian law, but these are not currently referred to the Court for consideration.

Gokulnath Shetty, then a Deputy Manager at PNB, participated in the scheme, granting LOU requests and providing the funds to Nirav's companies at very low interest rates and without requiring collateral. Further, he provided the LOUs without entering them into the bank's Core Banking System, which would have ensured they were backed by margin money or collateral.

b. The affidavit of Kapil Raj, the Deputy Director of the Directorate of Enforcement's Mumbai Zonal Office-I, details that under this scheme, 1,206 fraudulently obtained LOUs with a total value of approximately $373,963,000 issued from PNB to three entities that Nirav set up (M/s. Diamond R Us, M/s. Solar Export, and M/s. Stellar Diamond). Nirav subsequently dispersed most of those funds (approximately $276,544,604) to at least fifteen shell companies listed as jewelers in the United States, Hong Kong, and the United Arab Emirates. The shell companies, in turn, further dispersed funds.

c. Several individuals who served as dummy directors of Nirav's shell companies abroad told Indian authorities that they were dummy directors, and that the shell companies engaged in circular transactions. They explained that the shell companies imported and exported goods between one another and listed their inventory at inflated values on invoices to justify obtaining larger credit lines from Indian banks. They further explained that jewelry that was shipped between the companies had the diamonds and pearls removed, and that gold and silver were sent between the companies only for melting and not for resale. The entire purpose of the import and export scheme was

to generate false invoices and balance sheets to justify obtaining further lines of credit. Deputy Director Raj also describes that from 2015-2017, Nirav used funds fraudulently obtained from PNB to repay previous debts, rather than using the funds to conduct overseas business with suppliers.

d. According to Dinesh Bhardwaj, an Assistant General Manager at PNB: On January 26, 2018, Modi attended a meeting at PNB. During this meeting, Nirav called Bhardwaj's mobile number via WhatsApp and told bank staff that he authorized Modi to speak regarding Nirav's bank accounts and that whatever Modi agreed to with the bank would work for Nirav. During this meeting, Modi requested that PNB issue new, additional credit to Nirav's three parent companies through new LOUs, and Modi stated that in the meantime, Nirav would try to make payments to PNB that had come due on January 25, 2018, under previous LOUs. Bank officials told Modi that Nirav must immediately repay the outstanding LOUs before seeking further credit. Modi stated that he would talk to Nirav and then come back to PNB. On January 29, 2018, the bank decided to freeze Nirav's accounts and filed a complaint with India's Central Bureau of Investigation.

e. Also according to Bhardwaj, on February 8, 2018, Modi arranged and attended a video conference with Nirav and bank representatives from a consortium of Mumbai banks including PNB. During this meeting, Nirav confirmed that he had applied for and received the LOU funds from PNB on behalf of his three firms. Also during this meeting, the bank told Nirav that PNB had never approved or sanctioned the issuance of those LOU funds, and

4

bank officials accused Nirav (in Modi's presence) of having cheated the bank. Nirav objected, and PNB demanded that Nirav produce documents or orders from PNB that proved the LOU funds had been properly approved by the bank. PNB representatives also told Nirav that he would only be allowed to continue using PNB LOU funds if he produced these documents to the bank's satisfaction.

f. Several individuals who served as dummy directors of Nirav's shell companies in Dubai and Hong Kong told Indian authorities that in March 2018, after Nirav and his associates were under investigation in India, Modi took various actions to hide criminal proceeds, destroy evidence, and otherwise thwart the investigation. According to these directors, Modi traveled to the shell companies' locations in Dubai and Hong Kong, and took possession of cash, diamonds, pearls, and/or gold from the companies' premises. For example, Bhavik Shah ("Shah"), director of M/s Brilliant Diamonds, and Ashish Bajranglal Bagaria ("Bagaria"), director of M/s Eternal Diamonds Corp., stated that in March 2018, Modi came to Hong Kong in March 2018 and instructed the dummy companies there to liquidate. Further, Shah and Bagaria each stated that Modi instructed the directors in Hong Kong to pack all available stock, and that Modi took away 10-12 parcels of loose diamonds and some large stones from the company's premises. Ashish Kumar Mohan Bhai Lad ("Lad"), director of M/s Sunshine Gems Ltd., told Indian authorities that he gave approximately 3.5 million AED (approximately $953,000) in cash to Sandeep Mistry ("Mistry"),

director of World Diamond Distribution, who gave the money to Modi. Nilesh Mistry ("Nilesh"), a director of M/s Hamilton Precious Traders, stated that, at Modi's instruction, he withdrew 300,000-400,000 AED (approximately $81,690-$108,922) from company accounts, which Mistry then gave to Modi.

g. Modi also directed or arranged for the mobile phones of dummy directors in Hong Kong and Dubai to be destroyed, and he destroyed a server in Dubai that serviced the cell phones. For example, Bagaria stated that in March 2018, Modi came to Hong Kong and instructed the directors to destroy their old mobile devices. Netaji Mohite ("Mohite"), director of M/s Vista Jewelry FZE, stated that in March 2018, Modi met with dummy directors in Dubai, where they were instructed to deposit their mobile devices and received new phones. Divyesh Kumar Nareshkumar Gandhi ("Gandhi"), a director of M/s Aurogem Co., stated that Modi, who handled crisis management for Nirav's companies, destroyed the cell phones of the dummy directors in Dubai and Hong Kong, instructed the staff to destroy records and computers, and destroyed a secure server in Dubai that was used to send transaction instructions.

h. Modi also told dummy directors to travel to Egypt to avoid contact with Indian law enforcement. Individuals who traveled to Egypt at Modi's instruction, including Ashish and Mohite, stated that in Cairo, Modi's associates took their passports. Additionally, before the directors left Cairo, they were asked to sign papers falsely stating that the companies belonged to

the directors and were unrelated to Nirav. For example, Rushabh Jethava ("Jethava"), director of M/s Empire Gems, and Shreedhar Mayekar ("Mayekar"), director of M/s Unique Diamond, stated that before they left Cairo, they were asked to sign papers stating that their respective companies belonged to them, and not to Nirav. Further, according to Ashish, Modi offered him 2 million INR (approximately $23,000) to provide false testimony in Nirav's favor to European authorities.

7.    Modi may be found within the jurisdiction of this Court at Wende Correctional Facility, 3040 Wende Rd., Alden, NY 14004.

8.    Tom Heinemann, an Attorney-Adviser in the Office of the Legal Advisor for the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating copies of the Treaty and the diplomatic notes by which India requested extradition, stating that the Treaty covers the aforementioned offenses for which India seeks extradition, and confirming that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in India, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence at a future evidentiary hearing, if necessary.

9.    The declaration from the U.S. Department of State with its attachments, including copies of the Treaty and the diplomatic notes by which India requested extradition, is attached hereto as Exhibit A, and the certified documents India submitted in

support of extradition will subsequently be filed with this Court and are incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person issue in accordance with 18 U.S.C. § 3184 and the Treaty, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

s/FAUZIA K. MATTINGLY
Assistant United States Attorney

Sworn and subscribed to before me telephonically
on this _2.⁶_ day of July 2025.

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

## DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Attorney Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Nehal Deepak Modi. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and India are found in the Extradition Treaty between the United States of America and the Republic of India, signed on June 25, 1997, and entered into force July 21, 1999 ("the Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Embassy of India has submitted Diplomatic Note No WAS/PERS/815/87/2019, dated December 20, 2019, and Diplomatic Note No WAS/PERS/815/33/2019, dated June 8, 2021, formally requesting the extradition of Nehal Deepak Modi. Copies of the diplomatic notes are attached to this declaration.

4. When India formally presented my office with its requests for the extradition of Nehal Deepak Modi, they were bound and ribboned with the Department of State certification from the U.S. Embassy in Delhi and the ribbon of India's Ministry of External Affairs. A staff member in my office unbound the request and removed the ribbons so that the request could be scanned for the purpose of creating a legible electronic copy for review by the Departments of State and Justice, the Court, and defense counsel.

5. I hereby certify that, with the exception of the removal of the binding, the documents attached to this declaration are the full original extradition requests submitted by the Government of India under Diplomatic Note No WAS/PERS/815/87/2019, dated December 20, 2019 (the first extradition request), and Diplomatic Note No WAS/PERS/815/33/2019, dated June 8, 2021 (the second extradition request),and bear the certification of the United States Embassy in New Delhi.

6. In accordance with Article 20 of the Treaty, the Government of the United States of America provides legal representation in the U.S. courts for the Government of India in its extradition requests,

MODI GOV-000002
-2-

and the Government of India provides legal representation in its courts for extradition requests made by the United States.

7. The first count in the first extradition request of the offense of Money Laundering in violation of Section 3 of the Prevention of Money Laundering Act, 2022 (PMLA Special Case No. ECIR/MBZO-I/03/2018), and the offense in the second extradition request of Conspiracy to Cause Disappearance of Evidence of an Offense or to Give False Information to Screen an Offender in violation of Sections 120-B and 420 of the Indian Penal Code ("IPC") (Criminal Case No. RCBSM 2018 (E) 001 of CBI, BSFB, Mumbai), are covered under Article 2(1) of the Treaty and are referred to the court for consideration.

8. The second count of the offense of Money Laundering in the first extradition request (PMLA Special Case No. ECIR/MBZO-I/04/2018), and the additional offenses in the second extradition request (Conspiracy to Cheat and Dishonestly Induce Delivery of Property in violation of Sections 120-B and 420 of the IPC; Conspiracy to Commit Criminal Breach of Trust by a Public Servant, Banker, Merchant, or Agent in violation of Sections 120-B and 409 of the IPC; and Conspiracy to Commit Criminal Misconduct by a Public Servant in violation of Sections 13(1)(c) and (d) of the Prevention of Corruption Act, 1988) are not referred to the court for consideration.

9. The documents submitted by the Government of the Republic of India in support of its first extradition request were certified on November 8, 2019, by Charisse M. Phillips, Minister Counselor for Consular Affairs, in accordance with Title 18, United States Code, Section 3190. The documents submitted by the Government of India in support of its second extradition request were certified on December 15, 2020, by Morgan A. Parker, Minister Counselor for Consular Affairs, in accordance with Title 18, United States Code, Section 3190. Morgan A. Parker and Charisse M. Phillip at the time of their certifications, were the principal consular officers of the United States in the Republic of India.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 27th, 2025.

TOM HEINEMANN

MODI GOV-000003

-2-

Attachments:

    1. Copy of Notes

    2. Copy of Treaty

MODI GOV-000004



**Embassy of India**

2107 Massachusetts Ave. NW. Washington, DC 20008

Tel : 202-939-7006, Fax : 202-462-7269, Email: cpers.washington@mea.gov.in

No.WAS/PERS/815/33/2019

The Embassy of the Republic of India presents its compliments to the US Department of State and the US Department of Justice, Government of the United States of America and has the honor to enclose herewith an Extradition request in respect of **Mr. Nehal Deepak Modi**. The extradition request is based on Criminal Case No. RCBSM 2018 (E) 0001 of CBI, BSFB, Mumbai under section 120-B read with sections 420, 409 and 201 of Indian Penal Code and section 13(2) read with 13(1) of the Prevention Of Corruption Act 1988.

2.      These documents have been got authenticated from the US Embassy in New Delhi, as required under Article 10 of the bilateral Extradition Treaty.

3.      In view of the above, it is requested that the request for Extradition of Mr. Nehal Deepak Modi, to India may please be executed at the earliest.

3.      The Embassy of the Republic of India in the United States of America avails itself of this opportunity to renew to the US Department of State and the US Department of Justice, Government of the United States of America the assurances of its highest consideration.

June 8, 2021

**US Department of State**
**Ms. Amber Kluesener,**
Paralegal Specialist
Office of the Legal Adviser,
Law Enforcement & Intelligence
21st & C Street NW (Jogger's entrance)
Washington DC (2 copies)

Copy to **Ms. Andrea Tisi Austin**, Senior Trial Attorney, Criminal Division, Office of International Affairs, US Department to Justice, Washington DC 20530.

6/8/2021

EXT-NModi-1078

MODI GOV-000005



**Embassy of India**
2107 Massachusetts Ave. NW. Washington, DC 20008
Tel : 202-939-7006, Fax : 202-462-7269, Email: cpers.washington@mea.gov.in

No.WAS/PERS/815/87/2019

The Embassy of the Republic of India in the United States of America presents its compliments to the US Department of State and the US Department of Justice and has the honor to enclose herewith a formal Extradition request in respect of Mr.Nehal Modi@Nehal Deepak Modi, who is wanted in India in the following case:

*PMLA Special Case No.ECIR/MBZO-I/03/2018 dated 14.12.2018 and ECIR/MBZO-I/04/2018 dated 16.02.2018 under Prevention of Money Laundering Act, 2002 registered by the Directorate of Enforcement.*

2.    The requisition for extradition has been duly signed by the External Affairs Minister, Government of India and certified by U.S Embassy in New Delhi as per requirement of Article 10 of the Extradition Treaty between the Government of the Republic of India and the Government of the United States of America.

3.    In view of the above, it is requested that the request for extradition of Mr. Nehal Modi@Nehal Deepak Modi to India may please be executed at the earliest.

4.    The Embassy of the Republic of India in the United States of America avails itself of this opportunity to renew to the US Department of State and the US Department of Justice the assurances of its highest consideration

Washington DC, December 20, 2019

*Enclosure:  Vol 1 (Pages 1 to 365), Vol. 2 (Pages 366-741) & Vol. 3 (Pages 742 to 1074) in original*

**US Department of State**
**Ms. Amber Kluesener**
Paralegal Specialist
Office of the Legal Adviser
Law Enforcement and Intelligence
21st and C Street NW [Jogger's entrance]
Washington DC [Tel: 202-647-5111; 202-647-9500]

**Copy** [Copies of the 3 volumes mentioned above)] **to : Mr. Mark Tellitocci, Trial Attorney**, Criminal Division, Office of International Affairs, U.S. Department of Justice, Washington, D.C.  20530, Office: 202 353-7384, Mobile: 202 262-6883, E-mail : Mark.Tellitocci@usdoj.gov

EXTRADITION TREATY

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF THE REPUBLIC OF INDIA

2

## TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political Offenses |
| Article 5 | Military Offenses and Other Bases for Denial of Extradition |
| Article 6 | Prior Prosecution |
| Article 7 | Lapse of Time |
| Article 8 | Capital Punishment |
| Article 9 | Extradition Procedures and Required Documents |
| Article 10 | Admissibility of Documents |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition Made by More than One State |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Rule of Speciality |
| Article 18 | Waiver of Extradition |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Mutual Legal Assistance in Extradition |
| Article 23 | Ratification and Entry into Force |
| Article 24 | Termination |

MODI GOV-000008

3

The Government of the United States of America and the Government of the Republic of India;

Recalling the Treaty for the Mutual Extradition of Criminals between the United States of America and Great Britain, signed at London December 22, 1931;

Noting that both the Government of the United States of America and the Government of the Republic of India currently apply the terms of that Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime, recognizing that concrete steps are necessary to combat terrorism, including narcoterrorism, and drug trafficking, and, for that purpose, to conclude a new treaty for the extradition of fugitive offenders;

Have agreed as follows:

4

- 3 -

### Article 1
### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons who, by the authorities in the Requesting State are formally accused of, charged with or convicted of an extraditable offense, whether such offense was committed before or after the entry into force of the Treaty.

### Article 2
### Extraditable Offenses

1. An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty, including imprisonment, for a period of more than one year or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, aiding or abetting, counselling or procuring the commission of or being an accessory before or after the fact to, any offense described in paragraph 1.

3. For the purposes of this Article, an offense shall be an extraditable offense:

    (a)    whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology;

    (b)    whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court; or

    (c)    whether or not it relates to taxation or revenue or is one of a purely fiscal character.

5

- 4 -

4. Extradition shall be granted for an extraditable offense regardless of where the act or acts constituting the offense were committed.

5. If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request, even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

### Article 3
### Nationality

Extradition shall not be refused on the ground that the person sought is a national of the Requested State.

### Article 4
### Political Offenses

1. Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2. For the purposes of this Treaty, the following offenses shall not be considered to be political offenses:

    (a)    a murder or other willful crime against the person of a Head of State or Head of Government of one of the Contracting States, or of a member of the Head of State's or Head of Government's family;

    (b)    aircraft hijacking offenses, as described in The Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at the Hague on December 16, 1970;

    (c)    acts of aviation sabotage, as described in the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal on September 23, 1971;

6

- 5 -

(d)   crimes against internationally protected persons, including diplomats, as described in the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, done at New York on December 14, 1973;

(e)   hostage taking, as described in the International Convention against the Taking of Hostages, done at New York on December 17, 1979;

(f)   offenses related to illegal drugs, as described in the Single Convention on Narcotic Drugs, 1961, done at New York on March 30, 1961, the Protocol Amending the Single Convention on Narcotic Drugs, 1961, done at Geneva on March 25, 1972, and the United Nations Convention against Illicit Traffic in Narcotics Drugs and Psychotropic Substances, done at Vienna on December 20, 1988;

(g)   any other offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution; and

(h)   a conspiracy or attempt to commit any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses.

**Article 5**

**Military Offenses and Other Bases for Denial of Extradition**

1.  The executive authority of the Requested State may refuse extradition for offenses under military law which are not offenses under ordinary criminal law.

2.  Extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

7

- 6 -

### Article 6
### Prior Prosecution

1. Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. Extradition shall not be precluded by the fact that the authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested, or to discontinue any criminal proceedings which have been instituted against the person sought for those acts.

### Article 7
### Lapse of Time

Extradition shall not be granted when the prosecution has become barred by lapse of time according to the laws of the Requesting State.

### Article 8
### Capital Punishment

1. When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless:

    (a)    the offense constitutes murder under the laws in the Requested State; or

    (b)    the Requesting State provides assurances that the death penalty, if imposed, will not be carried out.

8

- 7 -

2. In instances in which a Requesting State provides an assurance in accordance with paragraph (1)(b) of this Article, the death penalty, if imposed by the courts of the Requesting State, shall not be carried out.

### Article 9

### Extradition Procedures and Required Documents

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests for extradition shall be supported by:

    (a)   documents, statements, or other types of information which describe the identity and probable location of the person sought;

    (b)   information describing the facts of the offense and the procedural history of the case;

    (c)   a statement of the provisions of the law describing the essential elements of the offense for which extradition is requested;

    (d)   a statement of the provisions of the law describing the punishment for the offense; and

    (e)   the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

3. A request for extradition of a person who is sought for prosecution shall also be supported by:

    (a)   a copy of the warrant or order of arrest, issued by a judge or other competent authority;

    (b)   a copy of the charging document, if any; and

    (c)   such information as would justify the committal for trial of the person if the offense had been committed in the Requested State.

4. A request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall also be supported by:

9

- 8 -

(a)  a copy of the judgment of conviction or, if such copy is not available, a statement by a judicial authority that the person has been convicted;

(b)  information establishing that the person sought is the person to whom the conviction refers;

(c)  a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d)  in the case of a person who has been convicted in absentia, the documents required in paragraph 3.

### Article 10

### Admissibility of Documents

The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a)  in the case of a request from the United States, they are certified by the principal diplomatic or principal consular officer of the Republic of India resident in the United States;

(b)  in the case of a request from the Republic of India, they are certified by the principal diplomatic or principal consular officer of the United States resident in the Republic of India, as provided by the extradition laws of the United States; or

(c)  they are certified or authenticated in any other manner accepted by the laws in the Requested State.

10

- 9 -

### Article 11
### Translation

All documents submitted by the Requesting State shall be in English.


### Article 12
### Provisional Arrest

1.  In case of urgency, a Contracting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest may be transmitted through the diplomatic channel. The facilities of the International Criminal Police Organization (Interpol) may be used to transmit such a request.

2.  The application for provisional arrest shall contain:

    (a)    a description of the person sought;

    (b)    the location of the person sought, if known;

    (c)    a brief statement of the facts of the case, including, if possible, the time and location of the offense;

    (d)    a description of the laws violated;

    (e)    a statement of the existence of a warrant of arrest or a finding of guilt or judgment of conviction against the person sought; and

    (f)    a statement that a request for extradition for the person sought will follow.

3.  The Requesting State shall be notified without delay of the disposition of its application and the reasons for any denial.

4.  A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required in Article 9.

MODI GOV-000016

11

- 10 -

5. The fact that the person sought has been discharged from custody pursuant to paragraph (4) of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

### Article 13
### Decision and Surrender

1. The Requested State shall promptly notify the Requesting State through the diplomatic channel of its decision on the request for extradition.

2. If the request is denied in whole or in part, the Requested State shall provide the reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3. If the request for extradition is granted, the authorities of the Contracting States shall agree on the time and place for the surrender of the person sought.

4. If the person sought is not removed from the territory of the Requested State within the time prescribed by the laws in that State, that person may be discharged from custody, and the Requested State may subsequently refuse extradition for the same offense.

### Article 14
### Temporary and Deferred Surrender

1. If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the Requested State, the Requested State, subject to its laws, may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by agreement of the Contracting States.

12

- 11 -

2. The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

### Article 15
### Requests for Extradition Made by More than One State

If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State it will surrender the person. In making its decision, the Requested State shall consider all relevant factors, including but not limited to:

(a)  whether the requests were made pursuant to treaty;

(b)  the place where each offense was committed;

(c)  the respective interests of the Requesting States;

(d)  the gravity of the offenses;

(e)  the nationality of the victim;

(f)  the possibility of further extradition between the Requesting States; and

(g)  the chronological order in which the requests were received from the Requesting States.

### Article 16
### Seizure and Surrender of Property

1. To the extent permitted under its laws, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense in respect of which extradition is granted. The items mentioned in this Article may be

13

- 12 -

surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The Requested State may condition the surrender of the property upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable.  The Requested State may also defer the surrender of such property if it is needed as evidence in the Requested State.

3. The rights of third parties in such property shall be duly respected.


### Article 17
### Rule of Speciality

1. A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

    (a)    the offense for which extradition has been granted or a differently denominated offense based on the same facts on which extradition was granted, provided such offense is extraditable or is a lesser included offense;

    (b)    an offense committed after the extradition of the person; or

    (c)    an offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment.  For the purpose of this subparagraph:

        (i)    the Requested State may require the submission of the documents called for in Article 9; and

        (ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2. A person extradited under this Treaty may not be extradited to a third State for an offense committed prior to his surrender unless the surrendering State consents.

14

- 13 -

3.  Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third State, if:

  (a)    that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

  (b)    that person does not leave the territory of the Requesting State within 15 days of the day on which that person is free to leave.


## Article 18
### Waiver of Extradition

If the person sought consents to surrender to the Requesting State, the Requested State may, subject to its laws, surrender the person as expeditiously as possible without further proceedings.


## Article 19
### Transit

1.  Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State.  A request for transit shall be made through the diplomatic channel.  The facilities of Interpol may be used to transmit such a request.  It shall contain a description of the person being transported and a brief statement of the facts of the case.  A person in transit may be detained in custody during the period of transit.

2.  No authorization is required where air transportation is used and no landing is scheduled on the territory of the Contracting State.  If an unscheduled landing occurs on the territory of the other Contracting State, the other Contracting State may require the request for transit as provided in paragraph 1.  That Contracting State shall detain the person to be

15

- 14 -

transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing.


### Article 20
### Representation and Expenses

1. The Requested State shall advise, assist, appear in court on behalf of the Requesting State, and represent the interests of the Requesting State, in any proceeding arising out of a request for extradition.

2. The Requesting State shall bear the expenses related to the translation of documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty.


### Article 21
### Consultation

The competent authorities of the United States and the Republic of India may consult with each other directly or through the facilities of Interpol in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

16

- 15 -

### Article 22

### Mutual Legal Assistance in Extradition

Each Contracting State shall, to the extent permitted by its law, afford the other the widest measure of mutual assistance in criminal matters in connection with an offense for which extradition has been requested.

### Article 23

### Ratification and Entry into Force

1. This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged as soon as possible.

2. This Treaty shall enter into force upon the exchange of the instruments of ratification.

3. Upon the entry into force of this Treaty, the Treaty for the Mutual Extradition of Criminals between the United States of America and Great Britain, signed at London December 22, 1931, shall cease to have any effect between the Government of the United States of America and the Government of the Republic of India. Nevertheless, the prior Treaty shall apply to any extradition proceedings in which the extradition documents have already been submitted to the courts of the Requested State at the time this Treaty enters into force, except that Article 17 of this Treaty shall be applicable to such proceedings.

### Article 24

### Termination

Either Contracting State may terminate this Treaty at any time by giving written notice to the other Contracting State, and the termination shall be effective six months after the date of such notice.

17

- 16 -

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments have signed this Treaty.

DONE at Washington, in duplicate, this Twenty-fifth day of June, 1997, in the English and Hindi languages, both texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE REPUBLIC OF INDIA:

18

DEPARTMENT OF STATE
WASHINGTON

June 25, 1997

Dear Mr. Minister:

    I refer to the extradition treaty between the Government of the United States of America and the Government of the Republic of India signed today.  It is the understanding of the Government of the United States of America that, as a general matter, upon extradition, a person shall be proceeded against or punished under the ordinary criminal laws of the Requesting State, and shall be subject to prosecution or punishment in accordance with the Requesting State's ordinary rules of criminal procedure.  If either party is considering prosecution or punishment upon extradition under other laws or other rules of criminal procedure, the Requesting State shall request consultations and shall make such a request only upon the agreement of the Requested State.

    I would appreciate receiving confirmation that your Government shares this understanding.

Sincerely,

Strobe Talbott
Acting Secretary

His Excellency
    Saleem Iqbal Shervani,
        Minister of State for External Affairs of India.

MODI GOV-000024

19

 **SALEEM I. SHERVANI**

विदेश राज्य मंत्री
भारत
MINISTER OF STATE FOR EXTERNAL AFFAIRS
INDIA

June 25, 1997

Dear Mr. Talbott,

I am writing with respect to your letter of June 25, 1997, which reads as follows :

" June 25, 1997

"Saleem Iqbal Shervani
Minister of State for External Affairs
Government of India:

" Dear Mr. Minister:

"I refer to the extradition treaty between the Government of the United States of America and the Government of the Republic of India signed today. It is the understanding of the Government of the United States of America that, as a general matter, upon extradition, a person shall be proceeded against or punished under the ordinary criminal laws of the Requesting State, and shall be subject to prosecution or punishment in accordance with the Requesting State's ordinary rules of criminal procedure. If either party is considering prosecution or punishment upon extradition under other laws or other rules of criminal procedure, the Requesting State shall request consultations and shall make such a request only upon the agreement of the Requested State.

"I would appreciate receiving confirmation that your Government shares this understanding.

"Sincerely,

"Strobe Talbott
"Acting Secretary"

I am pleased to confirm that the Government of the Republic of India shares the understanding expressed in your letter.

Yours sincerely,

(Saleem I. Shervani )

The Honorable Strobe Talbott,
Acting Secretary of State.